IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EVA JUDITH BURGOS-RIVERA, | ) | Case No. 1:17-cv-730 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Eva Judith Burgos-Rivera, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supported the ALJ's residual function capacity ("RFC") determination and his conclusion that Burgos-Rivera's did not meet the requirements of Listing 12.05 and because the ALJ fully and fairly developed the record, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.     Procedural History

Burgos-Rivera applied for DIB on May 30, 2013 (Tr. 126) alleging a disability onset date of May 14, 2013.  (Tr.24)  Burgos-Rivera alleged disability based on multiple sclerosis ("MS") and arthritis in the spine.  (Tr. 227)  Burgos-Rivera's application was denied initially (Tr. 126, 137) and on reconsideration.  (Tr. 146)  Burgos-Rivera filed a written request for rehearing.  (Tr. 153)  Administrative Law Judge Paul R. Bronson ("ALJ") heard the case on November 30, 2015. (Tr. 46-90)  The ALJ denied Burgos-Rivera's claim on February 3, 2016.  (Tr. 18)  The Appeals Council denied further review on February 9, 2017, rendering the ALJ's February 3, 2016, decision the final decision of the Commissioner.  (Tr. 1-3)

Burgos-Rivera now raises three arguments: (1) the ALJ improperly evaluated Listing 12.05(C); (2) the ALJ's failed to support his RFC determination with substantial evidence; and (3) the ALJ erred by failing to fully and fairly develop the administrative record.

## III.    Evidence

Because Burgos-Rivera raises only limited issues, it is unnecessary to summarize the entire record.

### A.      Personal, Educational and Vocational Evidence

Burgos Rivera was 37 years old on her alleged onset date, and had turned 40 by the time of the hearing.  (Tr. 37, 48)  Burgos-Rivera graduated from high school in 1993.  (Tr. 48)  She was not in special education when she was in school.  (Tr. 49)  Brewer worked as a power press operator from January 2001 until May 2013.  (Tr. 77, 79, 99)

**B.      Medical Records Related to Burgos-Rivera's Impairments**

Burgos-Rivera's primary treating physicians were Preetha Muthusamy, M.D.,[1] a neurologist, and Teah A. Tchelidze, M.D., her primary care physician.  I will describe medical records for these and other physicians in chronological order.

**1.      2012 Records**

On March 5, 2012, Dr. Muthusamy saw Burgos-Rivera regarding her headaches and prescribed Toradol.  (Tr. 281)  Burgos-Rivera reported that lying down increased her headache pain.  (*Id.*)  On July 5, 2012, Burgos-Rivera reported to Dr. Muthusamy that she became sleepy after taking her medications.  (Tr. 287)

On October 22, 2012, Dr. Muthusamy conducted a follow-up neurological evaluation regarding Burgos-Rivera's relapsing limiting type of MS.  (Tr. 282)  Burgos-Rivera reported that she no longer had numbness in her right arm, but experienced intermittent tingling in both of her legs when she sat or rested for a long time or when she assumed a particular posture.  (*Id.*)  She denied having any new neurological symptoms.  (*Id.*)  She also reported pain radiating to the right occipital area of her right temple.  (Tr. 283)  Dr. Muthusamy found Burgos-Rivera's mental status, speech, cranial nerve testing II through XII, tone, sensory testing, cerebellar testing, and gait testing were all normal.  (*Id.*)  She had 5/5 strength in all four extremities and her deep tendon reflexes were 2-.  (*Id.*)  Dr. Muthusamy prescribed continued treatment with Rebif and Tylenol, and directed the patient to stay off of Lyrica.  (*Id.*)

---

[1] The record has this physician's name spelled "Muthusamy" (e.g. Tr. 279) and "Muthasamy" (e.g. Tr. 284.  Because the doctor's signature appears to use the former spelling, her name will be spelled Muthusamy throughout this report and recommendation.

### 2.  2013 Records

On January 18, 2013, x-rays of Burgos-Rivera's thoracic and lumbosacral spine ordered by Dr. Tchelidze showed hypertrophic spurring at several levels.  (Tr. 472)

On March 15, 2013, Burgos-Rivera underwent a T6-T9 facet block procedure administered by Arpan Desai, M.D., to treat her facet syndrome.  (Tr. 471)  Burgos-Rivera had grossly normal anatomy.  (*Id.*)

On May 1, 2013, Burgos-Rivera told Dr. Muthusamy that the medication Rebif was not helping her and on May 5, 2013 she reported tiredness.  (Tr. 280)

On May 14, 2013, Burgos-Rivera had a follow-up neurological evaluation with Dr. Muthusamy.  (Tr. 279, 312-13)  She reported that she stopped taking Rebif because she was having flu-like symptoms and lacked energy to move around or to do her daily chores.  (Tr. 312)  She reported having 10/10 severity headaches in the right temporal area of her head that would last for five days.  (*Id.*)  She also reported having low back pain in her left hip and at nighttime on her left side that would cause numbness in her left leg.  (*Id.*)  Dr. Muthusamy found Burgos-Rivera's mental status, speech, cranial nerve testing II-XII, and sensory, cerebellar, and gait testing were all normal.  (Tr. 313)  She found increased tone in Burgos-Rivera's upper and lower right extremities, with 5/5 strength throughout and no evidence of pronator drift.  (*Id.*)  The straight leg raising test was positive on the left side with the left hip.  (*Id.*)  Dr. Muthusamy planned for Burgos-Rivera to have an MRI of her brain and cervical spine and an x-ray of her lower back and left hip and started her on Lyrica for her headaches and pain.  (*Id.*)

On May 16, 2013, an x-ray of Burgos-Rivera's lumbar spine found degenerative disc height loss at L4-5 and L5S1 and convex right thoracolumbar curve.  (Tr. 292)  The x-ray of her left hip was normal.  (*Id.*)

On May 17, 2013, Burgos-Rivera underwent an R T10-L1 facet block procedure administered by Dr. Desai to treat her facet syndrome.  (Tr. 470)  Burgos-Rivera had grossly normal anatomy.  (*Id.*)

On May 22, 2013, a MRI of Burgos-Rivera's cervical spine showed patchy cord signal intensity throughout her cervical spinal cord, particularly at the cervical medullary junction and laterally to the left at the C4 and T3 level.  (Tr. 290-91)  It also showed T2 hyper-intense lesions within the right lobe of the thyroid gland and white matter changes in the brain and cervical spinal cord without enhancement suggesting demyelination.  (Tr. 291)

On May 23, 2013, Dr. Tchelidze evaluated Burgos-Rivera for chest pain and found that her gait was normal and there were no focal neuro defects.  (Tr. 465)

On June 20, 2013, Burgos-Rivera complained to Dr. Tchelidze of numbness to her right leg and reported that her right leg had given way and caused her to fall and experience bruising and muscular sprain in her shoulder and lower back.  (Tr. 459)  She reported that she felt tired and was unable to go back to heavy manual labor work.  (*Id.*)  Dr. Tchelidze found Burgos-Rivera's gait, reflexes, and sensation were normal and there were no focal neuro defects.  (Tr. 461)  Dr. Tchelidze recommended that Burgos-Rivera take fall precautions and continue physical therapy and exercise.  (Tr. 462)

On October 21, 2013, Burgos-Rivera reported that her right upper and lower extremity pain and numbness paresthesia were getting worse.  (*Id.*)  She reported that she felt tired and took continuous thyroid supplementation.  (*Id.*)  Burgos-Rivera reported numbness and tingling, but no headache, confusion, dizziness, or fainting.  (Tr. 456)  Dr. Tchelidze found no focal neuro defects.  (Tr. 458)  Dr. Tchelidze diagnosed multiple sclerosis, hypothyroidism, abdominal pain, and cervicalgia.  (*Id.*)

On December 16, 2013, Dr. Tchelidze diagnosed Burgos-Rivera as suffering from multiple sclerosis, cervicalgia, demyelinating disorders, knee pain, hypertension, and hyperlipidemia.  (Tr. 320)

### 3.    2014 Records

On February 20, 2014, Dr. Muthusamy saw Burgos-Rivera for a follow up regarding her multiple sclerosis.  (Tr. 404)  Burgos-Rivera complained of right side weakness, blurred vision, and slightly affected memory.  (*Id.*)  Burgos-Rivera displayed normal musculoskeletal range of motion, no edema or tenderness, a normal mental status, orientation, affect, speech, language, and normal muscle tone, 5/5 muscle strength in upper and lower extremities, and a normal gait .  (Tr. 407)  Dr. Muthusamy noted Burgos-Rivera had been stable with no new MS exacerbation.  (*Id.*)  Dr. Muthusamy prescribed continued Tecfidera and Topomax.  (*Id.*)

On April 25, 2014, Dr. Tchelidze saw Burgos-Rivera regarding her back pain.  (Tr. 452)  Dr. Tchelidze found Burgos-Rivera's gait was normal, her spine had a good range of motion, there was muscular tenderness at the thoracic spine and shoulder, and there were no focal neurological defects.  (*Id.*)  She prescribed Meloxicam for Burgos-Rivera's cervicalgia and back pain and renewed Tecfidera.  (Tr. 454)

On May 13, 2014, Burgos-Rivera told Dr. Tchelidze that her chronic back pain was getting worse and she felt no relief with Tylenol or anti-inflammatories.  (Tr. 446)  Dr. Tchelidze found that Burgos-Rivera's gait was normal, she had pain in her mid-thoracic spine and right paraspinal area, no limitation in movement, muscle strength was symmetrical in bilateral upper and lower extremities, and there were no focal neurological defects.  (Tr. 449)  Dr. Tchelidze prescribed Gabapentin for Burgos-Rivera's demyelinating disorder, multiple sclerosis, and thoracic back pain.  (*Id.*)

On May 20, 2014, Dr. Muthusamy saw Burgos-Rivera for a follow up regarding her multiple sclerosis.  (Tr. 398)  Burgos-Rivera reported intermittent numbness in both legs and fingertips and burning pain along her spine, mid back, and shoulder blades triggered by moving her right arm.  (*Id.*)  Dr. Muthusamy noted Burgos-Rivera had memory trouble and had forgotten appointments.  (Tr. 399)  She found Burgos-Rivera exhibited no edema or tenderness and had a normal range of motion, mental status, memory, affect, judgment, gait, muscle tone, and 5/5 strength in upper and lower extremities.  (Tr. 401)  Dr. Muthusamy prescribed continued Tecfidera and recommended an MRI of Burgos-Rivera's brain and cervical spine.  (*Id.*)  An MRI of Burgos-Rivera's thoracic spine showed a probable demyelinating lesion within the right aspect of the cord at the T3 level.  (Tr. 469)

On June 4, 2014, an MRI of Burgos-Rivera's brain showed isolated foci of hyperintensity within the supratentorial white matter, brainstem, and cerebellum that were compatible with the clinical diagnosis of multiple sclerosis.  (Tr. 374)  There was no evidence of new lesions.  (Tr. 375)  The MRI of Burgos-Rivera's cervical spine showed no new lesions and no significant change in the number, size, or configuration of the existing lesions.  (*Id.*)  There was no evidence of acute demyelination in the upper spinal cord.  (Tr. 373)

On September 3, 2014, Burgos-Rivera complained of diarrhea after returning from a trip to Puerto Rico for her mother's funeral.  (Tr. 442)  She reported that her multiple sclerosis symptoms improved with gabapentin.  (*Id.*)  An examination showed normal gait and no focal neurological defects.  (Tr. 444-45)

On October 27, 2014, Burgos-Rivera told Dr. Muthusamy that she had constant pain in her lumbar spine and right shoulder which increased with walking and almost every activity.  (Tr. 391)  She rated her pain a 10 out of 10 but denied any radiation of the pain into her legs.

(*Id.*)  She complained of tingling in her right foot and leg, numbness in her right face and leg, blurry vision, memory trouble, and urinary frequency or urgency.  (Tr. 392)  Dr. Muthusamy found Burgos-Rivera had a normal gait, musculoskeletal range of motion, mental status, muscle tone, memory, affect, and judgment, and muscle strength testing of 5/5.  (Tr. 394)  The straight leg raising test was bilaterally negative and Burgos-Rivera had cervical or thoracic paraspinal muscle spasms.  (*Id.*)

On October 29, 2014, Dr. Tchelidze saw Burgos-Rivera regarding her mild upper back pain.  (Tr. 437)  Dr. Tchelidze found Burgos-Rivera's gait was normal and there were no focal neuro defects.  (Tr. 439-40)  Dr. Tchelidze started Burgos-Rivera on Nortriptyline and referred her for pain management evaluation and treatment.  (Tr. 440)

On November 5, 2014, Burgos-Rivera reported that her back pain had significantly improved.  (Tr. 433)  Dr. Tchelidze found Burgos-Rivera had a normal gait and no focal neuro defects.  (Tr. 434-35)

On November 20, 2014, a MRI of Burgos-Rivera's lumbosacral spine showed relatively mild lumbar degenerative changes and moderate bilateral foraminal narrowing at the L4-L5 level.  (Tr. 371)

### 4.     2015 Records

On January 29, 2015, Dr. Muthusamy saw Burgos-Rivera regarding her back pain.  (Tr. 383-84)  Burgos-Rivera reported constant pain, rated at 7-8/10, over her lumbar spine that rarely radiated into her right leg and increased with walking or washing dishes.  (Tr. 384)  She reported pain was associated with tingling in her right foot and leg, that physical therapy did not help, and that she stopped taking Neurontin because it made her sleepy.  (*Id.*)  Dr. Muthusamy found Burgos-Rivera had a normal musculoskeletal range of motion, gait, mental status, and increased

muscle tone in her legs. (Tr. 387) Dr. Muthusamy assessed relatively mild lumber degenerative change and found that Burgos-Rivera's clinical examination was stable. (*Id.*)

On March 26, 2015, Dr. Tchelidze saw Burgos-Rivera regarding her allergies and sinusitis. (Tr. 428) Burgos-Rivera reported that her pain was controlled and that she had no new neurological symptoms. (*Id.*) Dr. Tchelidze found that Burgos-Rivera had a normal gait and no focal neuro defects. (Tr. 431)

On April 30, 2015, Dr. Muthusamy saw Burgos-Rivera regarding her multiple sclerosis. (Tr. 377) Burgos-Rivera reported headaches, blurry vision, and memory trouble, but denied numbness. (*Id.*) Dr. Muthusamy found a normal musculoskeletal normal range of motion, mental status, affect, and gait, no edema or tenderness, increased tone in muscles, and 5/5 muscle strength in upper and lower extremities. (Tr. 380)

On May 12, 2015, a MRI of Burgos-Rivera's brain and cervical spine showed multiple intracranial white matter lesions compatible with multiple sclerosis. (Tr. 369) There were no new T2 lesions, no new enhancing lesions, and no significant cervical canal or foraminal stenosis. (*Id.*)

On June 1, 2015, Dr. Tchelidze saw Burgos-Rivera regarding pain in her eyes and coccyx area. (Tr. 412) Dr. Tchelidze found Burgos-Rivera had a normal gait and no focal neuro defects. (Tr. 415) Dr. Tchelidze recommended Burgos-Rivera continue her current regimen. (Tr. 417)

On June 18, 2015, Dr. Tchelidze saw Burgos-Rivera regarding her complaints of pain in her lower back after her hysterectomy, rectal pain, and lumbosacral pain that had not improved on Lyrica and nortriptyline. (Tr. 423) Dr. Tchelidze found Burgos-Rivera had a normal gait and no focal neuro defects. (Tr. 426)

On July 16, 2015, Kenneth Choi, M.D. saw Burgos-Rivera regarding her back pain.  (Tr. 475)  Burgos-Rivera reported an 8/10 rated, constant, sharp pain that did not radiate.  (*Id.*)  She reported that work aggravated and aqua therapy alleviated the pain to some degree.  (*Id.*)  She reported that her sleep and activities of daily living were affected by her pain.  (*Id.*)  Dr. Choi found that Burgos-Rivera had a normal gait and normal heel-toe walking, right-sided paravertebral tenderness at the T8-T10 level, full range of motion, and no motor weakness.  (Tr. 477)  Burgos-Rivera received acupuncture treatment and an anesthetic injection and stated that her pain was 0/10 after the procedure.  (*Id*.)  Dr. Choi recommended continued exercise, stretching, and massage therapy.  (Tr. 478)

On July 21, 2015, Burgos-Rivera visited Dr. Tchelidze regarding complaints of diarrhea.  (Tr. 418)  Dr. Tchelidze found Burgos-Rivera had a normal gait and no focal neuro defects.  (Tr. 421)

On August 27, 2015, Dr. Muthusamy saw Burgos-Rivera for a follow up regarding her multiple sclerosis.  (Tr. 358)  Burgos-Rivera reported an episode of numbness on her entire right side that lasted two weeks, which she claimed resulted from an acupuncture treatment.  (*Id*.)  Burgos-Rivera denied weakness or falls.  (*Id.*)  Burgos-Rivera also reported blurred vision and memory trouble.  (*Id.*)  Dr. Muthusamy found Burgos-Rivera had a normal musculoskeletal range of motion, mental status, and increased muscle tone in her legs and 5/5 muscle strength in both her upper and lower extremities.  (Tr. 361)  Dr. Muthusamy's examination of Burgos-Rivera's gait showed Burgos-Rivera showed mild favoring of her right leg.  (*Id.*)

### C.    Opinion Evidence

#### 1.    Michella Poion, PT, MPT – Physical Therapist

On August 27, 2013, Michella Poion, PT, MPT assessed Burgos-Rivera's physical RFC.  (Tr. 305)  She opined that Burgos-Rivera could walk and/or stand for less than one hour and sit

for thirty minutes in an eight-hour workday.  (*Id.*)  She opined Burgos-Rivera could lift or carry less than ten pounds frequently and occasionally, push or pull less than twenty pounds, bend without weight, reach "with L UE", and see, hear, and speak.  (*Id.*)  She opined that Burgos-Rivera displayed limited tolerance to multiple functional tasks.  (*Id.*)  PT Poion educated Burgos-Rivera on the importance of a continued yoga and aquatic program for disease progression prevention.  (*Id.*)  She opined that it would be beneficial to limit Burgos-Rivera's repetitive motion with bilateral upper extremities to prevent further injury.  (*Id.*)

### 2. Dr. Eulogio Sioson – Consultative Examiner

On September 26, 2013, Eulogio Sioson, MD, CIME, performed a disability evaluation regarding Burgos-Rivera's multiple sclerosis and abdominal pains.  (Tr. 306) Dr. Sioson found that Burgos-Rivera did not experience memory or concentration problems or headaches.  (*Id.*)  Dr. Sioson found Burgos-Rivera walked normally with no assistive device and was able to get up and down from the examination table, but lost balance trying to do heel/toe walking and rose from half squat with back pains.  (Tr. 307)  He found no tenderness, heat, redness, swelling, subluxation or gross deformity in Burgos-Rivera's joints.  (*Id.*)  She was able to grasp and hold a 1.6 lb. dynamometer and manipulate with each hand.  (*Id.*)  She had minimal neck and lower back tenderness.  (*Id.*)  Her straight leg raising when sitting was negative, but she experienced thigh and back pains lying 20 and 30 degrees.  (*Id.*)  Burgos-Rivera had numbness in all her toes. (*Id.*)  Burgos-Rivera had a reduced range of motion in her neck, shoulders, hips, knees, and lumbar spine.  (Tr. 309-10)

Dr. Sioson opined that Burgos-Rivera should be limited to light work.  (Tr. 307)

### 3. Abraham Mikalov, M.D. – State Agency Medical Consultant

On October 2, 2013, state agency medical consultant Abraham Mikalov, M.D. assessed Burgos-Rivera's physical RFC.  (Tr. 97-98)  He opined that Burgos-Rivera could lift and/or

carry twenty pounds occasionally and ten pounds frequently.  (Tr. 97)  He opined Burgos-Rivera could sit and stand and/or walk about six hours in an eight-hour workday.  (*Id.*)  He opined Burgos-Rivera had an unlimited ability to push and/or pull, other than the limitations on her ability to lift and/or carry.  (*Id.*)  He opined that Burgos-Rivera: had an unlimited capacity for stooping, kneeling, and crawling; could frequently climb ramps or stairs or crouch; and could balance occasionally.  (Tr. 97-98)  He opined that because Burgos-Rivera had some loss of balance related to her MS she should avoid all climbing on ladders, ropes, and scaffolding and avoid all exposure to hazards like machinery and heights.  (Tr. 98)

### 4.    Richard C. Halas – Consultative Psychological Examiner

On January 30, 2014, consulting clinical psychologist Richard C. Halas, M.A. performed a psychological evaluation of Burgos-Rivera's functioning levels.  (Tr. 322-27)  Burgos-Rivera reported that she was separated from her husband and was living with her 18-year-old son.  (Tr. 322)  Burgos-Rivera reported that she was born and educated in Puerto Rico, graduated from high school in 1993, and had been in the United States for sixteen years.  (*Id.*)  She had always been in regular classes, maintained average grades, and had never failed or been held back.  (*Id.*)  She reported that she did not use drugs, alcohol, or smoke cigarettes.  (Tr. 323)

Burgos-Rivera reported that she had significant back pain, headaches, and had been diagnosed with MS.  (Tr. 323)  She reported that she had previously taken Rebif for her MS, but was taking Tecfidera at the time of the evaluation.  (*Id.*)

Burgos-Rivera reported that she sometimes drives and used her driver's license as a form of photo identification.  (*Id.*)  Mr. Halas found Burgos-Rivera spoke clearly in Spanish and English, but spoke more Spanish than English.  (Tr. 324)  She was able to understand questions and respond appropriately in English.  (*Id.*)  Mr. Halas found Burgos-Rivera was tearful during the appointment and her psychomotor activity during the examination reflected retardation.  (*Id.*)

Mr. Halas found Burgos-Rivera showed some confusion and lack of awareness and that her long-term memory was below average.  (Tr. 325)

She reported that she and her son cooked, cleaned, shopped, and did laundry.  (Tr. 326) She reported that she got up at 7 A.M., took care of her personal hygiene, and then drove her son to school at 8 A.M.  (*Id.*)  She reported that she had no friends, hobbies, or recreational activities, did not read books or magazines, had a Facebook account, and "watch[ed] others on line."  (*Id.*) She reported she liked to watch Spanish soap operas and soccer on television and she and her son would go to watch indoor soccer games.  (*Id.*)

Mr. Halas found Burgos-Rivera struggled with memory functioning subsequent to her multiple sclerosis condition.  (Tr. 326)  He found all her scores were in the extremely low range. (*Id.*)  In a Wechsler Memory Scales IV test, Mr. Halas found Burgos-Rivera scored in the 0.1 percentile rank for auditory memory, less than 0.1 percentile for visual, immediate, and delayed memory, and the 0.2 percentile for visual working memory.  (Tr. 328)

Mr. Halas diagnosed Burgos Rivera with cognitive disorder and depressive disorder.  (Tr. 326)  He found her psychological stressors included unemployment, financial concerns, health concerns, multiple sclerosis, separation from her husband, and dependency upon her son.  (Tr. 327)  He gave her a GAF score of 45.  (*Id.*)

Mr. Halas opined that Burgos-Rivera appeared to have some problems in her abilities and limitations in understanding, remembering, and carrying out instructions because her multiple sclerosis condition had adversely affected her cognitive skills and, at times, she had difficulty in problem solving, retaining information, and comprehension.  (*Id.*)  He opined Burgos-Rivera appeared to have significant problems in maintaining attention and concentration, and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.  (*Id.*)

13

Mr. Halas opined that Burgos-Rivera's "psychological symptoms of depression and [*sic*] noteworthy." (*Id.*) Mr. Halas opined that Burgos-Rivera would have little or no problems in responding appropriately to work pressures in a work setting. (*Id.*) He noted that she denied having symptoms of anxiety and was not nervous, anxious, or apprehensive during the appointment. (*Id.*)

On April 14, 2014, Mr. Halas saw Burgos-Rivera to administer the Wechsler Adult Intelligence Scale IV test. (Tr. 334) Mr. Halas opined the testing indicated borderline intellectual functioning for verbal comprehension, perceptual reasoning, and working memory and that her processing speed was a weakness; he characterized it as "in that extremely low range." (*Id.*) He opined that Burgos-Rivera's full scale IQ was 67, which was "in the extremely low range and place[d] her at the first percentile when compared with the general population." (*Id.*) He opined that his "analysis of the subtest scatter indicates [] Burgos-Burgos-Rivera [*sic*] to be significantly below average in her ability to work in a rapid and accurate manner when performing on the substitution task (coding subtest)." (*Id.*) He opined that Burgos-Rivera was significantly below average in verbal abstractions, vocabulary, and in her fund of information and was significantly below average in "concentrate" skills. (Tr. 334-35) Mr. Halas opined that the close agreement between Burgos-Rivera's scores was "indicative of both a valid and accurate measure of the claimant's true overall long-term functioning and academic potentialities," but "generally seem[ed] inconsistent with previous academic backgrounds." (Tr. 335) He noted that Burgos-Rivera had indicated that she had been in regular classes when attending school in Puerto Rico. (*Id.*) Mr. Halas opined that Burgos-Rivera's "health issues ha[d] caused a regression in terms of cognitive and intellectual functioning." (*Id.*) He diagnosed Burgos-Rivera with borderline intellectual functioning. (*Id.*)

14

### 5.      Gerald Klyop, M.D. – State Agency Medical Consultant

On February 08, 2014, Gerald Klyop, M.D. assessed Burgos-Rivera's physical RFC.  (Tr. 110-112)  Dr. Klyop opined Burgos-Rivera could lift and/or carry twenty pounds occasionally and ten pounds frequently.  (Tr. 111)  He opined Burgos-Rivera could stand and/or walk four hours and sit for about six hours in an eight-hour workday.  (*Id.*)  He opined Burgos-Rivera had unlimited capacity to push and/or pull, other than the limitations in her abilities to lift and/or carry.  (*Id.*)  Dr. Klyop opined Burgos-Rivera could: frequently engage in crouching and climb ramps or stairs; occasionally balance, never climb ladders, ropes, or scaffolds, and had an unlimited capacity for stooping, kneeling, and crawling.  (*Id.*)  Dr. Klyop opined Burgos-Rivera should avoid all exposure to hazards, such as machinery and heights because she had some loss of balance related to her MS.  (*Id.*)

### 6.      Kristen Haskins Psy.D.  – State Agency Psychological Consultant

On April 24, 2014, Kristen Haskins, Psy.D., diagnosed Burgos-Rivera with multiple sclerosis, discogenic and degenerative back disorders, organic mental disorders, and affective disorders.  (Tr. 110)  She opined that Burgos-Rivera had moderate restriction of activities in daily living, maintaining social functioning, maintaining concentration, persistence, or pace, but that she had no repeated episodes of decompensation.  (Tr. 109)  She noted that comparison of Burgos-Rivera's WAIS-IV and WMS-IV scores suggested some memory difficulties, but that lower scores may have resulted because Burgos-Rivera was tested in English instead of her first language, Spanish.  (*Id.*)

Dr. Haskins opined Burgos-Rivera was moderately limited in her abilities to remember locations and work-like procedures and understand, remember, and carry out very short and simple instructions, and was markedly limited in her ability to understand, remember, and carry out detailed instructions.  (Tr. 113)  Dr. Haskins opined that Burgos-Rivera was moderately

15

limited in her abilities to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary work routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms.  (*Id.*)  Dr. Haskins opined Burgos-Rivera had some limitations in her ability to interact because of her symptoms of depression, but could superficially relate.  (Tr. 114)  Dr. Haskins opined Burgos-Rivera reported no history of problems dealing with stress, and was not nervous, anxious, or apprehensive.  (*Id.*)

### 7.    Coletta Germek, – Physical Therapist

On June 20, 2014, physical therapist Coletta Germek completed a functional assessment of Burgos-Rivera's physical limitations.  (Tr. 342)  She opined that Burgos-Rivera could stand for ten minutes without interruption, stand for two hours of an eight-hour workday, sit for twenty minutes without interruption and for six hours of an eight-hour workday, and lift or carry less than five pounds frequently and five to ten pounds occasionally.  (Tr. 343)  Ms. Germek noted that Burgos-Rivera reported her pain was 10/10, but did not appear to be in severe pain during the assessment.  (Tr. 343)  She also noted that Burgos-Rivera's subjective reports were not all consistent with objective measures, such as her claims that she could only sit 3-4 minutes when she sat 20 minutes during her evaluation.  (*Id.*)  Ms. Germek did not note any antalgia in Burgos-Rivera's gait, despite her report that her pain was 10/10.  (Tr. 342)  Burgos-Rivera's upper right extremity was weak, but her lower extremities had 4/5 strength throughout.  (*Id.*)  Ms. Germek noted Burgos-Rivera may have mild to moderate pain, which interferes with her function.  (Tr. 343)

### D.    Testimonial Evidence

#### 1.    Claimant's Testimony

At the November 30, 2015 hearing, Burgos-Rivera testified that she graduated from high school in 1993, was not in special education, and did not attain any degrees or certificates above the high school level.  (Tr. 49)  She testified she last worked in 2012 or 2013.  (Tr. 49-50)  She testified that she stopped working because she was feeling a lot of pain in her back and numbness and tingling on her right side due to her MS.  (Tr. 50-51)  She also stated that she had "thyroid" and some other condition that she was unable to remember, but no depression or other psychological problems.  (Tr. 51)  She stated the numbness on her left side prevented her from doing things on the left side that she could do on her right like washing her mouth.  (Tr. 57)

Burgos-Rivera stated that she would not lift a five pound bag of sugar, lift or carry a gallon of milk, or "try to do a lot of stuff" for herself because she had a lot of pain.  (Tr. 51)  She stated she could walk five minutes and stand in one place for three or four minutes at one time before she would have to sit down due to pain in her "rectal."  (*Id.*)  She testified she could sit for three to five minutes before she would need to stand up.  (Tr. 52)  She stated she did not have any stairs, didn't do squatting, and did not kneel, crawl, or bend forward at the waist.  (Tr. 52-53)

Burgos-Rivera testified that she lived with her adult son, daughter-in-law, sister, "and everyone else."  (Tr. 53)  She stated she sometimes prepared meals, but did not do dishes, house cleaning, laundry, yard work or gardening, shoveling, or dispose of garbage.  (Tr. 53-54)  Burgos-Rivera testified that she had a driver's license and would drive herself to the hospital if she had to, but preferred to have her sister take her to her appointments.  (Tr. 54)  She also stated her sister accompanied her when food shopping and Burgos-Rivera would not take items off the shelves or push the shopping cart.  (*Id.*)

17

Burgos-Rivera testified she liked watching TV and would "go with her [sister] to her home." (Tr. 55)  She stated she was able to follow the content on the "Spanish channels." (*Id*.) She testified she sometimes went on the internet and Facebook and Twitter, but did not read books, magazines, or newspapers in any language. (Tr. 56)

Burgos-Rivera testified that the medications she took did not help, but had side effects. (*Id*.)  She stated that she never drank alcohol or did illegal drugs. (Tr. 56-57)

## 2.  Jack Lebeau, M.D.

Jack Lebeau, M.D. testified that he was a board certified in internal medicine and cardiology who had been practicing for about 26 years. (Tr. 58)  Dr. Lebeau testified that he had knowledge of neurology and orthopedics and had treated hundreds of patients with MS. (Tr. 64, 66)  The ALJ requested that Dr. Lebeau indicate the medical names of those impairments that caused more than a minimal impact on Burgos-Rivera's ability to engage in any work or related activities for any period of twelve consecutive months or longer from May 14, 2013 to the present. (Tr. 59)  Dr. Lebeau responded that Burgos-Rivera had mild multiple sclerosis by imaging and MRI scanning. (*Id*.)  He stated that to make a diagnosis of multiple sclerosis it demands both neurological manifestations that change over time and which occupy different spaces of the brain tissue, but Dr. Lebeau found Burgos-Rivera did not have classic multiple sclerosis because her lesions did not change over time.

Dr. Lebeau also stated Burgos-Rivera had non-radical back pain, "which is lumbago, musculo pain, musculoskeletal pain in the back." (Tr. 59-60)  He noted that she had headaches from time to time, but not migraines, some dysfunctional urine bleeding, and a "peculiar pain in her right lower quadrant which has not been able to be diagnosed as anything physical." (Tr. 60) He noted she didn't seem to have any organ problems, abdominal wall problems, hernias, or anything else. (*Id*.)

18

Dr. Lebeau stated the problem was that Burgos Rivera "ha[d] claims of tremendous disability and neurological findings which are essentially negative but for maybe some increased muscle tone in her legs."  (Tr. 60)  He found that her walking, affect, intelligence, understanding, and communication were fine or without problems.  (*Id.*)  He noted that in a neurological exam on September 26, 2013 (Tr. 306-07), Burgos-Rivera had back pain, issues of balance, and complained of numbness in her toes, but was walking well, could do a half squat, "had full strength in all of her extremities, reflexes, [and] a negative lumb[a]r."  (Tr. 60-61)  He noted that the findings were the same in a neurological exam two years later on August 27, 2015.  (Tr. 61)  Dr. Lebeau noted Burgos-Rivera had strength in her extremities and good reflexes and there was no evidence of denervation from the brain.  (*Id.*)

Dr. Lebeau opined that he did not doubt Burgos-Rivera's MS diagnosis due to the MRI findings, but found that Burgos-Rivera seemed to be in a complete remission and had a very mild case.  (*Id.*)  Dr. Lebeau testified that Burgos-Rivera had no severe impairments and no physical limitations whatsoever in her RFC, because examinations did not show any deterioration over time or any real abnormality in Burgos-Rivera's ability to move.  (Tr. 61-62)  He recommended she undertake a rigorous and tough physical therapy program to get some muscle strength back and live a much more full life.  (Tr. 62)

Dr. Lebeau testified that Burgos-Rivera's IQ of 67 was borderline intelligence and "a lot of people with that kind of IQ are able to communicate and so forth."  He also noted that Burgos-Rivera had a depressed mood and flat affect during her functional assessment, and that was not the circumstance in which one would like to do an intelligence test because people who are depressed do poorer than their real level on IQ tests.  (Tr. 63-64)

When asked about findings of decreased numbness and decreased sensations in Burgos-Rivera's hands and feet and 4/5 strength in her right upper extremity (Tr. 304), Dr. Lebeau responded that Burgos-Rivera had some complaints, but they were "subjective things."  (Tr. 66) He stated that Burgos-Rivera did not have any lesions in her central nervous system that would lead to weakness, as such lesions would be foraminal.  (Tr. 66)

Dr. Lebeau testified that Burgos-Rivera's lumbar disc disease was mild, as there was no significant impingement and there was no communicative problem that was severe.  (Tr. 68)

### 3.   Dr. Larry Cesare - Psychological Expert

Dr. Larry Cesare testified that he was a clinical psychologist licensed in Ohio since 1993. (Tr. 68)  The ALJ asked Dr. Cesare to identify the medical names for Burgos-Rivera's impairments that have caused more than minimal impact on her ability to engage in work related activity for any period of twelve consecutive months or longer from May 14, 2013 to the date of the hearing.  (Tr. 69)  Dr. Cesare stated that the primary psychological disorder would be recurrent, moderate major depressive disorder.  (*Id.*)  He also noted cognitive disorder was mentioned in the record regarding a psychological consultative examination dated January 30, 2014 (Tr. 326) and the subsequent follow up assessment on April 15, 2014 (Tr. 334-335), which also indicated borderline intellectual functioning.  (Tr. 69)  Dr. Cesare testified that those diagnoses seemed to be based on the psychometric testing results involving the Wechsler memory scale and Wechsler intelligence scale.  (*Id.*)  He stated he could not verify the validity of those scores because there were no comments made as to whether or not the scores appeared to be valid, Burgos-Rivera's level or effort or cooperation, or whether language barriers impeded performance.  (Tr. 70)  Dr. Cesare stated he would not support the diagnoses of cognitive disorder, not otherwise specified, or borderline intellectual functioning without additional

20

information regarding how much motivation, cooperation, language, etc. may have impacted the psychometric results' validity.  (*Id.*)

Dr. Cesare opined that Burgos-Rivera appeared to have only mild levels of restriction in her activities of daily life.  (Tr. 71)  He found her difficulties in maintaining social functioning and concentration, persistence, and pace were on a moderate level.  (*Id.*)  He noted her limitations in this regard were only moderately impairing and there was no evidence of decompensation of extended duration.  (*Id.*)

Dr. Cesare opined that none of the C criteria in listing 12.04 were met or medically equaled in Burgos-Rivera's case.  (*Id.*)  He opined that Burgos-Rivera "could function in a low stress work environment with no stringent production quotas or time limits" and "could function with moderate amounts in superficial types of interpersonal interaction, but would not be able to manage intense or frequent interpersonal interaction, especially those involving confrontation, negotiation, arbitration, or . . .  supervision of other people."  (Tr. 71-72)  He noted that Burgos-Rivera functioned "quite well and steadily for 12 years in her work as a factory worker" in a front line factory position and there was no reason she wouldn't be able to continue that kind of work, if the parameters mentioned above were met.  (Tr. 72)

The ALJ asked Dr. Cesare whether, with the IQ score of 67, he was prepared to say that Burgos-Rivera met or medically equaled any provision of listing 12.05.  (Tr. 73)  Dr. Cesare answered that he was not prepared to do so, in part, because depression or subtle language barriers could be a factor for lower scores and the score may not be reliable.  (*Id*.)  Dr. Cesare also noted the "number of medical examinations in the record since October 2012 that repeatedly cite[d] mental status exam results as being within normal limits, normal, alert, coherent, oriented, cooperative, more abnormal behavioral appearance, normal, normal alertness, appropriate,

attentive, oriented to person, place, and time, affect normal, affect and judgment and memory

normal." (Tr. 74)  Dr. Cesare further opined:

> [I]n the historical context of a high school graduate with average grades, from a
> Puerto Rican high school with no special classes, no[t] being held back.  These
> [Wechsler] scores just really don't jive [*sic*] with the rest of the record.  So I have
> to assume that there is either some interference from depression, language barrier,
> or perhaps other sources of error in the test administration and the scoring
> process.

(*Id.*)  Dr. Cesare declined to give a lot of credit to the scores from either the Wechsler memory

scale or the Wechsler adult intelligence scale, which he also described as "discrepant between

themselves." (*Id.*)

### 4.    Vocational Expert, Robert E. Mosley, Ph.D.,

Robert E. Mosely, Ph.D. ("the vocational expert") testified that he was a certified

rehabilitation counselor and certified life care planner and had worked in the field of vocational

rehabilitation for over twenty-five years.  (Tr. 75)

Burgos-Rivera testified that since 2000 she had worked as a press operator and made

parts for corvettes, which involved her putting fiberglass parts into a machine and then taking the

parts out. (Tr. 76-77, 79)  She stated that she was standing most of the time.  (Tr. 78)  Dr.

Mosely classified the work as a power press tender, which was medium, lower level semi-skilled

work, with no skills that would be transferrable.  (Tr. 81)  Based on Burgos-Rivera's testimony

that she would sometimes do jobs that involved lifting more than twenty pounds, Dr. Mosely

categorized her past work at the medium level.  (*Id.*)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow the five-step sequential analysis set out in agency regulations, which can be paraphrased

as follows:

> 1. If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe
>    before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity, is suffering from a severe
>    impairment that has lasted or is expected to last for a continuous period of at least
>    twelve months, and his impairment meets or equals a listed impairment, claimant
>    is presumed disabled without further inquiry.
>
> 4. If the impairment does not meet or equal a listed impairment, the ALJ must assess
>    the claimant's RFC and use it to determine if claimant's impairment prevents him
>    from doing past relevant work. If claimant's impairment does not prevent him
>    from doing his past relevant work, he is not disabled.
>
> 5. If claimant is unable to perform past relevant work, he is not disabled if, based on
>    his vocational factors and RFC, he is capable of performing other work that exists
>    in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in
the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to produce evidence that establishes whether the claimant has the RFC and

vocational factors to perform work available in the national economy.  *Id.*

## V.    The ALJ's Decision

The ALJ's February 3, 2016 decision contained the following paraphrased findings:

1.  Burgos-Rivera met the insured status requirements of the Social Security Act
    through December 31, 2018.  (Tr. 26);

2.  Burgos-Rivera engaged in substantial gainful activity during the following
    periods: May 2013 through July 2013 (20 CFR 404.1520(b) and 404.1571 *et
    seq.*).  (*Id.*);

3.  Burgos-Rivera has the following severe impairments (20 CFR 404.1520(c)):
    multiple sclerosis, degenerative disc disease of the thoracic and lumbar spine,
    intermittent recurring headaches, possible secondary to the multiple sclerosis,
    intermittent recurring abnormal uterine bleeding, with intermittent recurring
    iron deficiency secondary to this bleeding, obesity, cognitive disorder,
    depressive disorder (Tr. 27);

4.  Burgos-Rivera did not have an impairment or combination of impairments that
    met or medically equaled the severity of one of the listed impairments in 20 CFR
    Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
    (*Id.*);

5.  After careful consideration of the entire record, the ALJ found that Burgos-
    Rivera had the RFC to work subject to the following limitations on her ability
    to work:
    a.  Burgos-Rivera could and can do work at the sedentary and light
        exertional levels only, with all that implies with respect to exertional
        and postural limitations (see 20 CFR 404.1567 for further details
        about what those are), subject to the following additional limitations;
    b.  Burgos-Rivera could and can stand and/or walk up to and no more
        than a total, in the aggregate, of 4 hours per 8-hour workday;
    c.  Burgos-Rivera could and can balance up to and no more than
        occasionally;
    d.  Burgos-Rivera could and can bend, stoop, crouch, squat, kneel, and
        crawl up to and no more than frequently;
    e.  Burgos-Rivera could and can climb steps and ramps up to and no
        more than frequently;
    f.  Burgos-Rivera could not and cannot climb ladders, ropes or
        scaffolds;
    g.  Burgos-Rivera could not and cannot work in proximity to
        unprotected heights, dangerous moving machinery, or other

workplace hazards;

    h. Burgos-Rivera could not and cannot operate a motor vehicle as part of a job;

    i. Burgos-Rivera could and can do simple tasks only;

    j. Burgos-Rivera could not and cannot do work involving high or strict production quotas;

    k. Burgos-Rivera could not and cannot do assembly line work or piece rate work;

    l. Burgos-Rivera could not and cannot do work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors;

    m. Burgos-Rivera could not and cannot manage or supervise other people;

    n. Burgos-Rivera could not and cannot do work involving her being responsible for the health, safety, or welfare of other people;

    o. Burgos-Rivera could and can interact with the public, coworkers, and supervisors up to and no more than occasionally;

    p. Burgos-Rivera could not and cannot do work involving more than rare changes or va1iation of tasks or routine.  (Tr. 29-30);

6. Burgos-Rivera was unable to perform any past relevant work (20 CFR 404.1565).  (Tr. 37);

7. Burgos-Rivera was born on August 5, 1975 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).  (*Id.*);

8. Burgos-Rivera has at least a high school education and is able to communicate in English (20 CFR 404.1564).  (*Id.*);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Burgos Rivera is "not disabled," whether or not Ms. Burgos-Rivera has transferable job skills (*See* SSR 82-41and20 CFR Part 404, Subpart P, Appendix 2).  (*Id.*);

10. Considering Burgos-Rivera's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Burgos-Rivera can perform (20 CFR 404.1569 and 404.1569(a)).  (*Id.*);

11. Burgos-Rivera has not been under a disability, as defined in the Social Security Act, from May 14, 2013, through the date of this decision (20 CFR 404.1520(g)).  (Tr. 38).

Based on these findings, the ALJ determined that Burgos-Rivera was not disabled from

May 14, 2013 through February 3, 2016, the date of his decision.  (Tr. 38)

## VI.     Law & Analysis

### A.     Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).  The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999).  "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing*

*Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied.  If not, reversal is required, unless the error of law was harmless.  *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.     The ALJ Did Not Err by Not Including a Discussion of Listing 12.05(C) in His Decision

Burgos-Rivera argues the ALJ erred by failing to analyze Listing 12.05(C), which concerns intellectual disability, and that the error was harmful "as the evidence shows she likely meets the listing."  ECF Doc. 12, Page ID# 547.  The commissioner, though acknowledging the ALJ did not explicitly discuss listing 12.05, points out that the regulations do not require the ALJ

to discuss listings when the record does not raise a substantial question on whether the claimant could qualify as disabled under a particular listing.  ECF Doc. 14, Page ID# 574.  The commissioner argues that "the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Id.* (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)).  Rather, "[a]n ALJ should discuss a listing when 'the record raises a substantial question as to whether the claimant could qualify as disabled under a listing.'" *Id.* (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x at 641).

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at Step Three.  20 C.F.R. § 404.1520; *see also Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder."); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.1986).  The claimant has the burden to prove that all of the elements are satisfied.  *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir.1984).  "The burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986).  The court may look to the ALJ's decision in its entirety to justify the ALJ's Step Three analysis.  *See Snoke v. Astrue*, 10-cv-1178, 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).  It is not sufficient to come close to meeting the conditions of a Listing.  *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).  In order to conduct a meaningful

review, the ALJ must make sufficiently clear the reasons for his decision.  *See Keyes v. Astrue*, 1:11-cv-00312, 2012 WL 832576, at * 5–6 (N.D. Ohio March 12, 2012); *Reynolds*, 2011 WL 1228165, at * 4–5; *Marok v. Astrue*, 5:08CV1832, 2010 WL 2294056, at *3 (N.D. Ohio Jun.3, 2010).

At the time of the ALJ's February 2016 decision,[3] Listing 12.05 provided, in relevant part:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1.  "Under each [intellectual disability] listing, including Listing 12.05(C), a claimant must establish that her impairment: (1) satisfies the 'diagnostic description in the introductory paragraph *and* any one of the four sets of criteria.'"  *Oddo v. Astrue*, No. 5:12-CV-00532, 2012 WL 7017622, *3 (N.D. Ohio Dec. 10, 2012) (quoting 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00(A)) (emphasis in original), *adopted by sub nom, Oddo v. Comm'r of Soc. Sec.*, No. 5:12 CV 532, 2013 WL 486276 (N.D. Ohio Feb. 6, 2013); *see also Foster v. Halter*, 279 F.3d at 354.

To show that her impairment meets subsection C of Listing 12.05, Burgos-Rivera was required to show that she had: "(1) significantly subaverage general intellectual functioning with

---

[3] The Social Security Administration revised the criteria in the Listing of Impairments that are used to evaluate claims involving mental disorders in adults under titles II and XVI of the Social Security Act, and the new rules became effective on January 17, 2017.  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66137, 66138 (Sept. 26, 2016) (codified at 20 C.F.R. §§ 404 and 416).

deficits in adaptive functioning prior to age twenty-two; (2) a valid verbal, performance, or full

scale IQ of 60 to 70; and (3) another physical or mental impairment imposing an additional and

significant work-related limitation of function." *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x

533, 539 (6th Cir. 2014) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00A, 12.05C).

> In his Step Three analysis, the ALJ stated:

> While the record indicates that Ms. Burgos-Rivera has severe physical
> impairments, none reaches the level of severity required by the Listing of
> Impairments either singly or in combination.  No treating or examining physician
> has indicated findings that would satisfy the severity requirements of one of the
> Listed Impairments at 20 CFR Part 404, Appendix 1.

(Tr. 27)  The ALJ further stated that "two experts who testified at the hearing also concluded that

Ms. Burgos-Rivera's impairments do not meet or medically equal the listings."  (Tr. 29, 61-62,

71)

### 1.    Valid IQ Score

The ALJ stated that "Burgos-Rivera's alleged borderline intellectual functioning is not a

medically determinable impairment because there is no medical evidence of record for IQ

testing."  (Tr. 27)  However, as Burgos-Rivera points out, later in his decision the ALJ explicitly

referred to the IQ testing Mr. Halas performed.  (Tr. 32)  The ALJ stated:

> On April 15, 2014, Ms. Burgos-Rivera returned to Mr. Halas to take the Wechsler Adult
> Intelligence Test IV [].  She had a Full Scale IQ of 67 on the test.  Mr. Halas diagnosed
> Ms. Burgos-Rivera with borderline intellectual functioning and noted that Ms. Burgos-
> Rivera's scores were indicative of both a valid and accurate measure of her overall
> functioning [].

(*Id.*)  The undersigned finds that the ALJ's "finding" that there was no evidence of record for IQ

testing was merely an inadvertent drafting mistake, as evidenced by his subsequent discussion.

*C.f. Oddo v. Astrue*, 5:12-cv-00532, 2012 WL 7017622, at *4; *see also Gribbins v. Comm'r of*

*Soc. Sec*., 37 F. App'x 777, 779 (6th Cir.2002) (agreeing with the district court that the ALJ's

decision contained a drafting error and noting that "[t]he findings and conclusions of the

Commissioner are reviewed by this court in the context of the record as a whole").

The commissioner argues that although Burgos-Rivera's had a full scale IQ test result of 67 in April 2014, the ALJ found that Burgos-Rivera did not meet the requirements of Listing 12.05(C) based on the hearing testimony of psychological expert Dr. Cesare.  ECF Doc. 14, Page ID# 575.  The commissioner noted that "[a]t the hearing, the ALJ specifically asked [] Dr. Cesare whether Plaintiff's impairments met or medically equaled listing 12.05, and Dr. Cesare testified that they did not (Tr. 73)."  *Id*.  Dr. Cesare also testified that he was neither able to verify nor refute the validity of Burgos-Rivera's Wechsler memory scale and Wechsler intelligence scale scores, in part because there was no comment regarding whether the scores appeared valid or Burgos-Rivera's level of effort or cooperation.  (Tr. 70)

Burgos-Rivera counters that because the "ALJ dismissed Dr. Cesare's opinion and gave it 'no weight,'" the ALJ's reliance on this opinion was erroneous.  ECF Doc. 15, Page ID# 590 (citing *Berryhill v. Shalala*, 4 F.3d 993, (6th Cir. 1993)).  Burgos-Rivera also argues that because the ALJ did not cite Dr. Cesare's opinion as a basis for his decision that she did not meet a listing, the court should reject the commissioner's reliance on the opinion.  *Id*.  Burgos-Rivera also argues that Dr. Cesare's opinion is inconsistent.  *Id.* at 589.

Burgos-Rivera does not accurately characterize the ALJ's decision.  The ALJ did not give Dr. Cesare's opinion "no weight."  Rather, the ALJ rejected certain of Dr. Cesare's opinions, such as the opinion that a language barrier might be a problem for Burgos-Rivera, but "[w]eight was given to his other opinions."  (Tr. 35-36)  Moreover, in his Step Three analysis, the ALJ relied upon Dr. Cesare's opinion and stated "[t]wo experts who testified at the hearing also concluded that Ms. Burgos-Rivera's impairments do not meet or medically equal the listings."

However, Burgos-Rivera's full scale IQ score was 67 (Tr. 334) and the ALJ did not make

a finding that the score was invalid.  Accordingly, given the ALJ's failure to discount this IQ score, it appears Burgos-Rivera met her burden under Listing 12.05(C) to show she had an IQ score of between 60 and 70.  However, for the reasons discussed below, her other evidence is inadequate.

### 2.    Additional and Significant Work-Related Limitation of Function

To meet Listing 12.05(C), in addition to a low IQ score a claimant must have a physical or mental impairment imposing an additional and significant work-related limitation of function. *See Peterson v. Comm'r of Soc. Sec*., 552 F. App'x at 539 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00A, 12.05C).  "[A]n impairment that is 'severe' necessarily constitutes a significant additional limitation."  *Oddo v. Astrue*, No. 5:12-cv-00532, 2012 WL 7017622, at *5 (citing 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00A); *see also Breitenstein v. Astrue*, No. 3:10CV00032, 2011 WL 1235018, at *13 (S.D. Ohio Jan. 6, 2011), *adopted by sub nom*., *Breitenstein v. Comm'r of Soc. Sec*., No. 3:10CV32, 2011 WL 1234902 (S.D. Ohio Mar. 30, 2011).  At Step Two, the ALJ found that Burgos-Rivera had several severe impairments, including multiple sclerosis, degenerative disc disease of the thoracic and lumbar spine, headaches, uterine bleeding, obesity, cognitive disorder, and depressive disorder.  (Tr. 26-27)  Thus, there is no dispute that Burgos-Rivera met this requirement of Listing 12.05(C).

### 3.    Plaintiff Cannot Demonstrate Intellectual Disability Onset before Age Twenty-two

"In order to satisfy the diagnostic description of Listing 12.05, a claimant must prove that she meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009).  "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Id*. at 677.  "A claimant may

meet the onset requirement either directly or circumstantially." *Wright v. Astrue*, No. 2:12-CV-112, 2013 WL 753823, at \*10 (S.D. Ohio Feb. 26, 2013), *adopted by sub nom.*, *Wright v. Comm'r of Soc. Sec.*, No. 2:12-CV-112, 2013 WL 1282643 (S.D. Ohio Mar. 27, 2013). Further, courts in this district have held that "*significant* deficits in adaptive functioning are required before the diagnostic criteria can be considered satisfied." *Madrigal v. Comm'r of Soc. Sec.*, No. 3:15 CV 2314, 2016 WL 8607003, at \*9 (N.D. Ohio Dec. 28, 2016), adopted by, No. 15-CV-2314, 2017 WL 1113365 (N.D. Ohio Mar. 24, 2017).

Burgos-Rivera argues that her full scale 67 IQ score, the evidence of record showing deficits in her adaptive functioning, and the lack of evidence that she experienced a traumatic event indicate that she likely had deficits in adaptive functioning prior to the age of 22. *See* ECF Docs. 12 and 15, Page ID# 550-51, 590-91. The commissioner counters that the record doesn't support a finding of deficits in adaptive functioning prior to age 22, in part because Burgos-Rivera graduated from high school and maintained average grades (Tr. 32, 48, 322) and she had a history of semi-skilled work as a press operator (Tr. 37). *See* ECF Doc. 14, Page ID# 575 (citing *Foster*, 279 F.3d at 354-55). Burgos-Rivera also points to parts of the record allegedly showing deficits in her adaptive functioning and argues that the ALJ did not address whether the evidence of record was sufficient to satisfy the requirement of deficits in adaptive functioning prior to age 22. *See* ECF Doc. 15, Page ID# 591-93.

The evidence does not demonstrate or support onset of "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age 22. Burgos-Rivera has failed to show that her general intellectual functioning was "significantly subaverage" prior to that age. None of her testing or evaluation was contemporaneous with her developmental period; she was already 38-years-old when the Wechsler testing was done. (Tr. 328-32, 334-40)

Burgos-Rivera's present-day IQ scores do not serve as evidence that she suffered subaverage intellectual functioning or deficits in her adaptive functioning during her developmental period. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492 (6th Cir. 2010) ("A claimant must produce evidence beyond his present IQ scores to show that he exhibited deficits during his developmental period.") (Citing *Foster*, 279 F.3d at 354-55).

The evidence regarding Burgos-Rivera's academic record also provides substantial evidence to support the ALJ's implicit conclusion that Burgos-Rivera did not manifest significantly subaverage general intellectual functioning or adaptive deficits during her developmental period.  The ALJ pointed out that Burgos-Rivera had graduated from high school in Puerto Rico in regular classes and maintained average grades, and he cited a record showing she was never failed or held back in school.  (Tr. 32, 323)  Burgos-Rivera's subsequent work history of doing lower-level, semi-skilled work as a power press tender from 2000 until 2013 (Tr. 37, 76, 81) likewise undermines her contention that she suffered from the requisite deficits in adaptive functioning during the developmental period.  *See Justice v. Comm'r Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (noting that the claimant "had a lengthy work history, including a variety of semiskilled and unskilled positions"); *Foster*, 278 F.3d at 355 (finding the claimant's work as an accounting clerk demonstrated that she had the ability to perform relatively complicated tasks prior to the claimant's injury); *Poll v. Berryhill*, No. 3:16CV2061, 2017 WL 3731988 (N.D. Ohio Aug. 30, 2017) ("Consideration of Plaintiff's work history . . . provides insight as to whether she had intellectual deficits prior to age twenty-two."); *Tullius v. Astrue*, No. 2-10-CV-00455, 2011 WL 839259, at *5 (S.D. Ohio Mar. 4, 2011) (finding claimant's seventeen years of gainful employment did not support an onset of impairment before age 22).

Further, in his Step Three analysis regarding listings 12.02 and 12.04, the ALJ found Burgos-Rivera only had moderate restrictions in activities of daily living, because she reported that she was able to drive and could do the laundry, vacuuming, cleaning, cooking, dishes, and grocery shopping.  (Tr. 28, citing Tr. 306)  The ALJ also found Burgos-Rivera only had moderate difficulties in her social functioning.  (Tr. 29)

Clinical psychologist Mr. Halas diagnosed Burgos-Rivera with "borderline intellectual functioning," rather than intellectual disability.  (Tr. 32, 334-335)  "While a specific diagnosis of [intellectual disability] is not required by Listing 12.05, a diagnosis by a clinical psychologist that the claimant is functioning at a higher level than [intellectual disability], even while the IQ tests are below 71, is an important factor for determining that the claimant cannot meet even the requirements of the introductory paragraph of Listing 12.05C."  *Madrigal v. Comm'r of Soc. Sec.*, No. 3:15 CV 2314, 2016 WL 8607003, at *10; *see also Dowling v. Comm'r of Soc. Sec.*, No. 1:16-cv-01280, 2017 WL 2417077, at *10 (N.D. Ohio May. 18, 2017); *Uleski v. Comm'r of Soc. Sec.*, No. 1:13 CV 2023, 2014 WL 2114814, at *4 (N.D. Ohio May 20, 2014).  Further, psychological expert Dr. Cesare declined to testify that Burgos-Rivera met the requirements of listing 12.05, in part because there were a number of medical examinations in the record since October 2012 that repeatedly found that Burgos-Rivera exhibited a normal mental status.  (Tr. 73-74, 282, 313, 361, 379-80, 386-87, 394, 400-01, 407).

"A substantial question about whether a claimant meets a listing requires more than . . . a mere toehold in the record on an essential element of the listing."  *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013).  Like the claimant in *Sheeks,* Burgos-Rivera has failed to flag any evidence showing that she had subaverage intellectual functioning or adaptive-skills limitations before age twenty-two.  *Id.* (finding an ALJ did not err by failing to discuss listing

12.05(C) when the claimant failed to flag any record evidence suggesting he had trouble caring

for himself or handling social situations before age twenty-two).  Consequently, the undersigned

finds the ALJ did not commit reversible error in failing explicitly to discuss listing 12.05(C).

It is readily apparent from the ALJ's questions to the consulting psychologist at the

hearing that the ALJ considered the potential applicability of Listing 12.05.  The ALJ's choice

not to discuss that Listing in his decision is more an indication of the lack of evidence to support

the applicability of the Listing than it is of any potential error.  And I find substantial evidence

supports the ALJ's conclusion that Burgos-Rivera did not satisfy her burden to prove that she

met the requirements for Listing 12.05.

### C.     The ALJ Supported His RFC Determination with Substantial Evidence

Burgos-Rivera argues that the ALJ erred when he gave "weight" to the opinions of

multiple state agency medical consultants, physical therapists, and consultative examiners, but

failed to specify how much weight was given to these opinions.  ECF Doc. 12, Page ID# 552.

Burgos-Rivera argues that "[t]he ALJ's failure to give specific weight to the opinions and

reasons for that weight deprives the Court of the ability to conduct meaningful review."  *Id.*

(citing *Keefer v. Astrue*, No. 1:09-cv-2390, 2010 WL 3222057, at *9 (N.D. Ohio Aug. 6, 20101)

*adopted by sub nom.*, *Keefer v. Comm'r of Soc. Sec.*, No. 1:09 CV 2390, 2010 WL 3222050

(N.D. Ohio Aug. 13, 2010)).

The commissioner counters that "[w]hile an ALJ must consider all medical opinions in

the record, the regulations do not require an ALJ to specify the amount of weight given to each

medical opinion in any certain terms (*e.g.* none, little, some, great)."  ECF Doc. 14, Page ID#

577 (citing 20 C.F.R. § 404.1527).  The commissioner's position is correct on this issue.

Courts in this district have found that ALJ RFC determinations have been supported by substantial evidence in instances where the ALJ simply "gave weight" to an examining consultant or state agency medical consultant's opinion.  *See e.g. Hoover v. Comm'r of Soc. Sec.*, No. 1:16-CV-02928, 2017 WL 7052008, at *15-16 (N.D. Ohio Oct. 24, 2017) ("The ALJ explained that he 'gave weight to Dr. Wax's opinion to the extent that the evidence shows that the claimant has limitations with social interaction and stress intolerance.'"), *adopted by*, No. 1:16-CV-2928, 2018 WL 559124 (N.D. Ohio Jan. 23, 2018); *Pimentel v. Comm'r of Soc. Sec.*, No. 1:16CV2099, 2017 WL 3505298, at *10-11 (N.D. Ohio June 29, 2017) ("I gave weight to the other opinions . . . ."), *objections overruled*, No. 1:16-CV-2099, 2017 WL 3494339 (N.D. Ohio Aug. 15, 2017); *Acosta v. Comm'r of Soc. Sec.*, No. 1:16CV1737, 2017 WL 2859800, at *10-11 (N.D. Ohio June 16, 2017), *adopted by*, No. 1:16CV1737, 2017 WL 2840762 (N.D. Ohio July 3, 2017).  Further, as the commissioner correctly notes, an ALJ is not procedurally required to give good reason for the weight given to the opinions of a non-treating source in the same manner that is required for treating source opinions.  *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016), *reh'g denied* (Sept. 20, 2016); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ([T]he SSA requires ALJs to give reasons for only treating sources.); *Marotta v. Comm'r of Soc. Sec.*, No. 1:16 CV 1169, 2017 WL 3065273, at *7 (N.D. Ohio July 19, 2017) ("an ALJ is not required to provide the same 'good reasons' for discounting a one-time examining physician as she is for a treating physician").

The most relevant case that Burgos-Rivera cites, *Keefer v. Astrue*, is distinguishable because in that case the ALJ presented a detailed summary of the doctor's opinion, but failed to consider or weigh the opinion in her discussion of the opinion evidence.  *See Keefer v. Astrue*, No. 1:09-CV-2390, 2010 WL 3222057, at *8.

Here the ALJ considered the opinions of record, identified the issues on which he gave weight to the opinions of the examining and non-examining sources, and explained his rationale for incorporating record-supported limitations into Burgos-Rivera's RFC. (Tr. 34-36) For instance, the ALJ gave weight to Dr. Sioson's opinion that Burgos-Rivera would be limited to light work, because the ALJ found the opinion generally consistent with Dr. Sioson's examination findings and the medical evidence of record. (Tr. 34) The ALJ gave weight to Mr. Halas's diagnoses and to his other opinions, but only to the extent those opinions helped persuade him that the medical limitations in Burgos-Rivera's RFC findings were as he stated in his decision and that no greater or additional limitations were needed. (*Id.*) Accordingly, the undersigned finds that the ALJ properly weighed the opinion evidence.

Burgos-Rivera also argues that the ALJ improperly gave weight to medical source opinions that were based on an incomplete medical record. ECF Doc. 12, Page ID# 553. Specifically, Burgos-Rivera argues that the various sources that rendered opinions in 2013 and 2014 did not have access to medical evidence extending through August 2015. *Id*. at 553-54. The commissioner counters that the fact that additional treatment records came after the non-examining state agency medical and psychological consultants issued their opinions does not preclude the ALJ from considering the opinions. *See* ECF Doc. 14, Page ID# 578.

Courts in the Sixth Circuit have held that "[t]here is no categorical requirement that the non-treating source's opinion should be based on a 'complete' or 'more detailed and comprehensive' case record." *Taylor v. Comm'r of Soc. Sec.*, No. 14CV686, 2015 WL 4730716, at *11 (N.D. Ohio Aug. 10, 2015). Rather, "opinions need only be 'supported by evidence in the record.'" *Id.* (quoting *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir.2011)). When an ALJ grants weight to a non-examining physician's opinions based on an incomplete

case review, the ALJ must indicate that he has considered the subsequently-generated evidence.
*Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 F.
App'x. 580, 585 (6th Cir.2007)).

The ALJ's discussion of the medical source opinions rendered in 2013 and 2014 shows
that the ALJ considered evidence generated after the assessments were completed.  (Tr. 34-36)
For example, when discussing Dr. Mikalov's October 2, 2013 physical RFC assessment, the ALJ
stated:

> Evidence received after these opinions (and which these state medical consultants
> therefore never saw or considered) was consistent with the evidence the medical
> consultants did see or consider and there was nothing to persuade me that Ms.
> Burgos-Rivera's condition got significantly worse, or that Ms. Burgos-Rivera's
> residual functional capacity findings got significantly more limited after the
> evidence that the state mental consultants saw came into the record.

(Tr. 34)  The ALJ made a similar statement in his analysis of Dr. Klyop's February 8, 2014
physical RFC assessment.  (Tr. 35)  The undersigned finds that the ALJ properly considered the
medical examinations and evidence that came into being after the medical sources rendered their
assessments, and the ALJ took into account any relevant changes – or lack thereof – in Burgos-
Rivera's condition.  *C.f. McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009)
(finding an ALJ did not err in relying on an "out of date" state agency physicians' opinion
because the ALJ considered the medical examinations that occurred after the assessment and
took into account relevant changes in the plaintiff's condition).

Burgos-Rivera further argues that the ALJ erred because he granted weight to Dr.
Haskin's opinion, but "offer[ed] no opinion why many functional limitations rendered in this
case were not adopted."  ECF Doc. 12, Page ID# 554.  Burgos-Rivera also argues that the ALJ's
explanation regarding the weight he gave to Ms. Halas and Dr. Haskins's opinions were vague
and confusing because the ALJ failed to explain what specific findings supported which

evidence.  *Id*. at 554-55.  Burgos-Rivera's arguments are not well-taken.  "Simply put, the ALJ was not required to discuss every limitation or piece of medical evidence put before him, especially" when the physician at issue "was not entitled to deference as a treating source." *Beauchamp v. Comm'r of Soc. Sec*., No. 1:12 CV 2839, 2014 WL 1154117, at *11 (N.D. Ohio Mar. 21, 2014) (citing *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir.2003)); *see also Bailey v. Comm'r of Soc. Sec*., 413 F. App'x 853, 855 (6th Cir. 2011) (an ALJ "is not required to analyze the relevance of each piece of evidence individually.  Instead, the regulations state that the decision must contain only 'the findings of facts and the reasons for the decision.'"); *Corbett v. Colvin*, No. 5:15CV1035, 2016 WL 3247876, at *7 (N.D. Ohio May 16, 2016) (the ALJ is not required to analyze the relevance of each piece of evidence individually), *adopted by*, No. 5:15 CV 1035, 2016 WL 3217898 (N.D. Ohio June 9, 2016); *Purtty v. Comm'r of Soc. Sec.*, No. 1:13 CV 1204, 2014 WL 3510991, at *9 (N.D. Ohio July 10, 2014).  Here, the ALJ discussed Dr. Haskin's opinion and gave weight to his opinions regarding mental impairments and mental RFC limitations to the extent that they helped persuade him that the 'B' and 'C' criteria were as stated in his decision, and that no greater or additional limitations needed to be incorporated in Burgos-Rivera's RFC.  (Tr. 35)

Burgos-Rivera also takes issue with the ALJ's reasoning that there was nothing in the evidence received after the state agency medical consultants rendered their opinions to persuade the ALJ that Burgos-Rivera's condition got worse, given that the ALJ found Burgos-Rivera was more limited than the state agency medical consultants.  ECF Doc. 12, Page ID# 555.  This argument is also without merit.  The ALJ's discussion of the medical evidence from 2014 and 2015 showed that Burgos-Rivera's examination findings were generally normal, her multiple sclerosis was stable, and she reported some of her conditions had improved with treatment.  (*See,*

*e.g.,* Tr. 32-33, 361, 379-380, 386-387, 394, 400-401, 407, 421, 426, 428, 430-431, 433, 435-436, 439-440, 444-445, 448-449, 452, 477).  MRI studies of Burgos-Rivera's brain and spine showed that her white matter lesions were stable and there were no new T2 or enhancing lesions. (Tr. 32-33, 362, 369, 371, 373)

Burgos-Rivera's arguments are without merit and I recommend that the court conclude that the ALJ supported his RFC with substantial evidence.

### D.    The ALJ Fully and Fairly Developed the Administrative Record

The ALJ stated that he gave no weight to testifying medical expert Dr. Lebeau's opinions that Burgos-Rivera had no severe impairments and that her RFC need not include any physical limitations because he found those opinions were contradicted by the weight of the evidence of the record considered as a whole.  (Tr. 35)

Although Burgos-Rivera agrees with the decision to discount Dr. Lebeau's opinions, she argues that the ALJ, having found it necessary to call a medical expert, had a duty to obtain a replacement expert once Dr. Lebeau was found wanting.  *See* ECF Doc. 12, Page ID# 555. Burgos-Rivera argues that "[t]he ALJ could have ordered a consultative exam to fulfill his duty to develop" the record, but "instead relied on opinions from sources that did not have the benefit of reviewing the entire record."  *Id*. at 556.  The commissioner counters that when a medical record is amply developed, an ALJ's decision on whether to seek testimony from a medical expert is discretionary.  *See* ECF Doc. 14, Page ID# 579 (citing *Griffith v. Comm'r of Soc. Sec*., 582 F. App'x 555, 562 (6th Cir. 2014)).  The commissioner noted that the ALJ ordered a consultative examination in this case (Tr. 306-10), and Burgos-Rivera did not present any authority indicating that an ALJ must obtain more than one consultative examination.  *Id*.  The undersigned agrees with the commissioner on this issue.

41

"An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster*, 279 F.3d at 355 (citing 20 C.F.R. §§ 404.1517, 416.917); *see also Pollard v. Comm'r of Soc. Sec.*, No. 1:10-cv-714, 2012 WL 95426, at *4 (S.D. Ohio Jan. 12, 2012). The evidence of record contains – and the ALJ considered – opinions from consultative examiner Dr. Sioson and state agency medical consultants Dr. Mikalov and Dr. Kylop regarding Burgos-Rivera's physical impairments and limitations. (Tr. 34, 35, 97, 98, 110-12, 306-07) As discussed above, the ALJ's analysis of these opinions makes it apparent that the ALJ considered evidence generated after the assessments were completed. (Tr. 34-36) Thus, the undersigned finds the ALJ did not abuse his discretion when he decided not to obtain additional testing from a medical expert. The record contained sufficient expert testimony to substantiate the ALJ's conclusions. *C.f. Foster*, 279 F.3d at 356 (finding an ALJ did not abuse his discretion in denying requests for additional testing or expert testimony where there was sufficient testimony in the record for the ALJ to evaluate the claimant's condition and RFC).

Burgos-Rivera's reliance on *Dimmings v. Comm'r of Soc. Sec.*, No. 1:13-cv-00146, 2014 WL 296866 (N.D. Ohio Jan 27 2014) is misplaced. In *Dimmings*, the ALJ discounted the medical expert's opinion due to the expert's area of board certification and unfamiliarity with several terms in the exhibits. *Dimmings v. Comm'r of Soc. Sec.*, No. 1:13-cv-00146, 2014 WL 296866, at *8. Similarly, in this case, Burgos-Rivera's attorney argued that Dr. Lebeau's opinions should be given no weight because he was not a specialist in the applicable medical disciplines. (Tr. 35, 266) The ALJ rejected this argument and stated that 20 C.F.R. 404.1513 "does not say that [a medical expert] must be certified in a particular specialty in order to testify as a medical expert regarding impairments that are usually treated by medical experts certified in that specialty." (Tr. 35).

In *Dimmings*, the ALJ also discounted the medical expert's opinion because the expert appeared unfamiliar with the record and was not sufficiently prepared. *Dimmings v. Comm'r of Soc. Sec.*, No. 1:13-cv-00146, 2014 WL 296866, at *8. However, at hearing in this case, Dr. Lebeau testified that he reviewed all the exhibits in the case file through 15F and demonstrated his command of the record by citing to exhibits during his testimony. (Tr. 58-60, 63)

"In the instant case, the ALJ did not discount a medical expert's opinion for reasons under the ALJ's control like the ALJ in *Dimmings*, who allowed testimony from a medical expert who was not qualified or unprepared, chose not to postpone the hearing, and interpreted medical evidence without the assistance of the medical expert." *Evans v. Berryhill*, No. 5:16CV1113, 2017 WL 1839218, at *12 (N.D. Ohio Apr. 19, 2017), *adopted by sub nom.*, *Evans v. Comm'r of Soc. Sec.*, No. 5:16CV1113, 2017 WL 1788839 (N.D. Ohio May 5, 2017).

The ALJ in the present case did not act in a manner to prevent Burgos-Rivera from obtaining a full and fair hearing and the undersigned finds Burgos-Rivera's argument regarding the decision not to call an additional expert witness should be rejected.

## VII.    Recommendations

Because (1) substantial evidence supported the ALJ's conclusion that Burgos-Rivera's intellectual impairments did not meet the requirements of Listing 12.05; (2) substantial evidence supported the ALJ's RFC determination; and (3) the ALJ fully and fairly developed the record, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: March 28, 2018

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).